Harold **AGELOFF** and Carol M. Ageloff, as Personal Representatives of the Estate of Scott Alan Ageloff, Deceased, Plaintiffs–Appellees,

v.

**DELTA AIRLINES INC.,**
Defendant–Appellant.

No. 86–6022.

United States Court of Appeals, Eleventh Circuit.

Nov. 18, 1988.

Barwick & Dillian, P.A., Lyndall M. Lambert, Howard E. Barwick, Thomas E. Ice, Miami Shores, Fla., for defendant-appellant.

Robert M. Montgomery, Jr., Montgomery Searcy and Denney, Edna L. Caruso, West Palm Beach, Fla., for plaintiffs-appellees.

Before VANCE and ANDERSON, Circuit Judges, and BROWN *, Senior Circuit Judge.

JOHN R. BROWN, Senior Circuit Judge:

Scott Alan Ageloff was killed in the crash of Delta Airlines Flight 191 at the Dallas–Ft. Worth Regional Airport on August 2, 1985. In January 1986 Ageloff's parents—as personal representatives of his estate—brought this diversity wrongful death action against Delta Airlines. Delta conceded liability, and the case went to trial only for the determination of damages. Unlike the typical wrongful death case, damages sought by the parents are not the pecuniary loss sustained by their being deprived of contributions to them by their son. Rather it is a claim by his estate of the accumulations which the decedent would have generated had he continued to live. It comes about by § 768.21 of the Florida Wrongful Death Act [1] and the statutory definition of "net accumulations." [2]

---

* Honorable John R. Brown, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. Section 768.21(6) provides:
   [t]he decedent's personal representative may recover for the decedent's estate the ... loss of the prospective net accumulations of an estate, which might reasonably have been expected but for the wrongful death, reduced to present money value.

2. Section 768.18(5) provides:
   "Net accumulations" means the part of the decedent's expected net business or salary income, including pension benefits, that the decedent probably would have retained as savings and left as part of his estate if he had lived his normal life expectancy. "Net business or salary income" is the part of the decedent's probable gross income after taxes, excluding income from investments continuing beyond death, that remains after deduct-

The jury returned a verdict of $1 million in favor of Ageloff's [3] estate.

Delta appeals, contending that the trial court erred by (i) permitting the calculation of Ageloff's projected annual saved net income by a method which contravenes the Express Exclusion [4] contained in Fla.Stat. § 768.18(5), (ii) allowing an improperly speculative, multiple recovery [5] by admitting evidence concerning the effects of inflation upon the dollar amounts of Ageloff's expected future "net accumulations," (iii) declining to give Delta's requested instruction that any damage award would not be subject to federal income tax, and (iv) awarding as costs expert witness fees in excess of the $30 amount expressly authorized in 28 U.S.C. § 1821(b). We certify the basic questions of law to the Supreme Court of Florida and defer decision on several subsidiary issues until receipt of its opinion.

### Measures of a Man's Life

At the time of his death, Scott Ageloff was an unmarried twenty-nine year old Florida resident with no dependents and was employed by the Ageloff family-owned toy business, Harry's Kidsworld, Inc. (Kidsworld), in which he owned a 25% share.

Ageloff's parents, as personal representatives of his estate, brought this diversity wrongful death action against Delta. Delta conceded liability for compensatory damages. The estate agreed to waive all other claims for damages, including any claim for punitive or exemplary damages. The case went to trial for the determination of damages only, under the Florida Wrongful Death Act, Fla.Stat. §§ 768.16—768.27 (notes 1 and 2, *supra*).

Before trial, Delta made a Motion in Limine to exclude all evidence relating to the value of Kidsworld and its subsidiaries. That motion was not opposed by the estate, and was granted.[6] At trial, Delta made a second Motion in Limine, to exclude—on the basis of § 768.18(5) (n. 2, *supra*)—evidence of Ageloff's reinvestment into Kidsworld of a portion of his share of its profits. After an initial deferral, that motion was denied.

### The Battle of Experts

Two expert witnesses, Drs. Cunitz and Goffman, testified for the estate concerning the dollar value of the loss of net accumulations sustained by the estate and also submitted written reports of their re-

---

ing the decedent's personal expenses and support of survivors, excluding contributions in kind.
(Emphasis added).
Because of its extreme importance, we shall refer to the underscored provision as the "Express Exclusion."

3. Except where context indicates otherwise, reference to Ageloff is to Scott Ageloff.

4. *See* n. 2, *supra.*

5. Delta's brief phrases the errors this way:
[ (i) ] The inclusion of interest on retained net income in the calculation of net accumulations results in double recovery of the interest income which provides a windfall for the plaintiff and prejudices the defendant.
[ (ii) ] Allowing the use of a hypothetical salary coupled with hypothetical reinvestments in the calculation of net accumulations results in triple recovery of interest income and opens the door to highly inflated claims for lost net accumulations in self-employment cases which cannot be objectively determined.

[ (iii) ] Interest rates on net business or salary income retained as savings are too speculative to be included in a damage award for lost net accumulations and would result in widely disparate damage awards and uncertainty in the law.

6. The substance of the motion was:
The Plaintiffs contend that the value of the family business has decreased as a result of the death of Scott Ageloff. The Plaintiffs further contend that they are entitled to recover on behalf of the decedent's estate the loss in the value of the shares of Harry's Kidsworld, Inc. which were owned by Scott Ageloff when he died.
... The alleged loss in the value of the decedent's ownership interest in a family-owned business is not a proper element of damages under the Florida Wrongful Death Act, Fla.Stat. §§ 768.16 *et seq.*, Fla.Stat. Consequently, evidence relating to the value of Harry's Kidsworld, Inc. both before and after the death of Scott Ageloff is irrelevant and inadmissible.
R. Vol. 1, p. 46–2.

spective calculations.[7] Dr. Mellish testified on the dollar value of the loss, as Delta's expert.[8] The essence of each expert's analysis is set forth in Table 1 for ease of reference, and then elaborated upon in the text.

TABLE I

| (a) | AGELOFF ESTATE EXPERTS | | DELTA EXPERTS |
| | (b) | (c) | (d) |
| --- | --- | --- | --- |
| | Goffman | Cunitz | Mellish |
| L1: Remuneration from Kidsworld annually | $40,000 earned | $41,250 earned | $29,688 received |
| L2: Annual growth rate of L1 | 10.0% | 11.5% | X, where X is a positive but |
| A. Inflation component | 6.5% | 6.5% | unspecified |
| B. Real growth component (experts' own terminology varies) | 3.5% | 5.0% | growth rate without a component for inflation |
| L3: Portion of L1 not consumed | savings rate 25% | savings rate 10–25% | net accumulations rate 25% |
| L4: Rate of return on savings reinvested in Kidsworld | 12.5% | 18.0% | 0% |
| L5: Net accumulations at end of life expectancy (unreduced to present value) | $36,171,212 | $55,540,850 | unspecified |
| L6: Discount rate | 7% | 7% | (X–1)% (see L2 above) |
| L7: Net accumulations at end of life expectancy (reduced to present value) | $1,842,794 | $2,829,688 | $279,828 |

Dr. Goffman began by postulating that in fiscal 1985 the amount of remuneration Ageloff earned (as opposed to the amount he actually *received*)[9] as an officer of the business had been $40,000 (Table I, line 1, col. (b)).[10] He then estimated the annual

7. *See* nn. 16 and 22, *infra.*

8. He did not render a formal written report because he "was never asked for one" by Delta. The only evidence of his computations is his own testimony about those calculations. That testimony was not sufficiently detailed to permit us to reconstruct those calculations precisely.

9. At trial, Delta consistently objected that admission of evidence of Kidsworld's earnings—introduced to support the contention that Ageloff's true or total earnings from Kidsworld were greater than the amount he received in compensation—violated its pretrial Motion in Limine, which had been granted without opposition. An inspection of the text of that motion (*see* n. 6, *supra*) reveals, however, that in granting it the District Court determined only that such evidence would be irrelevant and inadmissible insofar as it related to any alleged loss in the value of Ageloff's shares in Kidsworld. When such evidence later proved to be relevant to another issue in the case—namely, the value of Ageloff's lost earnings stream—then the granting of that pretrial motion did not preclude admission of such evidence on that issue.

10. Dr. Goffman's basis for doing so, as revealed in his written report, was that

in the last five years Scott Ageloff was not paid a salary commensurate with his productivity. In fact, his salary fluctuated widely, reflecting the fact that he drew only the amount he personally needed and invested the remaining salary due him directly back in the family's business. From 1981 to 1984, he received an average annual gross salary of $28,774 per year, ranging from a low of $20,800 in 1982, to a high of $37,467 in 1983.

According to both his parents and his accountant, he should have been paid at least the same amount as his father, which was approximately $40,000 in 1985. This figure is further supported by the fact that since his

nominal growth rate of Ageloff's earnings at 10% (Table I, line 2, col. (b)).[11] That growth rate included components due to (i) inflation (line 2A) and (ii) increase in Ageloff's personal "productivity (line 2B)."[12] Dr. Goffman also predicted that Ageloff would have saved 25% (line 3, col. (b)) of his income and that he would have reinvested all of these savings into Kidsworld.[13] Based on his analysis of the company's earnings, Dr. Goffman calculated that these reinvested savings would yield an annual return of 12.5% (line 4, col. (b)).[14] Dr. Goffman also assumed that the return on reinvested savings is properly a part of

"net accumulations" as defined in Fla.Stat. § 768.18(5).[15] Starting from these assumptions, Dr. Goffman calculated that the prospective net accumulations of the estate, unreduced to present value, were $36,171,-212 (line 5, col. (b)).[16]

Dr. Cunitz' calculations appear to have been performed in substantially the same manner as Dr. Goffman's.[17] Dr. Cunitz estimated (i) Ageloff's annual earnings from Kidsworld at the time of his death at $41,250 (line 1, col. (c)),[18] (ii) the annual nominal growth rate of Ageloff's annual earnings from Kidsworld at 11.5% (line 2,

death, the firm had to hire two additional people to carry on the functions of the decedent, one at a cost of $25,000, and a second at between $15,000 and $20,000 per year. Thus, $40,000 is a low estimate of what it cost to replace him.

**11.** Goffman report:
We have examined a host of data that reflect the salaries of a wide range of executives. Generally, excluding fringe benefits, the growth in such salaries ranges from 8 to 15 percent over a lifetime. In line with our conservative stance, we assume a 10 percent average annual increase from 1985 through 2030.

**12.** Dr. Goffman testified on direct examination that:
[T]here are two elements involved in projecting income. One is the underlying inflation rates of the economy. The second is what economists call productivity.... Productivity is the amount an individual earns over and above inflation, but comes about because he becomes more experienced in his work. He learns new techniques, new technology, develops it in an amount over and above inflation. R. Vol. 4, p. 2–114.

**13.** Goffman report:
At levels of income which Scott Ageloff had the capacity to earn, and given his relatively conservative spending habits as described by his family, we shall assume that the average spending/saving pattern he demonstrated during 1981–84 would have been typical over the remainder of his life. That is, he would consume approximately 75 percent of his after-tax income and save the remaining 25 percent. Further we shall assume that he had been saving and would continue to save by reinvesting in the family firm. While this is a readily defensible assumption for the next 10 to 15 years, there might be a time in the future in which other investments would be more profitable. However, up to this point,

the earnings on the equity in [Kidsworld] have far exceeded most other investments. In fact, in our analysis we have simply assumed that Scott Ageloff would have continued reinvesting in his family's firm since it had consistently yielded at least 15 percent on equity (after taxes).

**14.** Goffman report:
[Kidsworld] ... increased its gross revenue at a rate in excess of 12 percent [since 1981], and its gross profits grew even more rapidly, at least 15 percent per year.... [P]ast experience provides us with a yield of at least 15 percent per annum (after taxes).... However, given our conservative stance, and the assumption of slower growth in the toy industry after 2010, we shall apply a net yield of 12.5 percent, on average.

**15.** *See* n. 2, *supra.*

**16.** As justification for his conclusion Dr. Goffman presented elaborate calculations and tabular data which for our purposes need not be restated here.
We likewise disregard an apparent discrepancy between his figures between $38,750,300 and $36,171,212.

**17.** *But see* the possible anomaly briefly discussed in n. 22, *infra.*

**18.** Cunitz report:
Operating ratios for [Standard Industrial Classification] # 5945, Retail Hobby, Toy & Game Shops, are available for the years 1983 to 1985 from Robert Morris Associates, the national association of bank loan and credit officers. It indicates average officers' compensation equal to 4.5% of sales. Applying this ratio to actual 1985 net sales for Harry's Kidsworld shows total compensation of $82,-500. According to Mr. & Mrs. Ageloff, Scott deserved compensation equal to his father, so appropriate compensation for both would

col. (c)),[19] (iii) Ageloff's savings rate at 10% for 1986 and increasing gradually and steadily thereafter to 25% for A.D. 2016 and thereafter (line 3, col. (c)),[20] and (iv) predicted that Ageloff would have left these savings in Kidsworld, receiving an annual return of 18% (line 4, col. (c)).[21] Dr. Cunitz also assumed that the return on reinvested savings is properly a part of "net accumulations" as defined in

have been $41,250 for the fiscal year ended August 31, 1985.

**19.** On direct examination Dr. Cunitz explained the rationale behind this figure:

Q: $41,250 to Scott Ageloff, at the time of his death, August the 2d, 1985. Then, with that figure, what did you do with it, Dr. Cunitz, in order to determine the net accumulations to his estate?

A: I grew that figure annually by *an overall 11 and a half percent, which consisted of two parts; an expected long-term inflation of 6 and a half percent, and a real growth in wages of 5 percent a year.*

Q: Why 5 percent a year?

A: In my opinion, that is reasonable for an executive of a profitable, rapidly growing business, who can control how much compensation he gets himself.

. . . . .

Q: Now, would anything less than 5 percent, in your opinion, be realistic for a person such as Scott Ageloff, in this business?

A: Not for this type of individual, and this type of business.

R. Vol. 6, p. 28.

**20.** Cunitz report:

The savings rate varies according to the absolute amount of gross personal income. Poor families tend to have negligible savings while wealthy individuals save a relatively high proportion of their income. Considering the past life style of Scott Ageloff and his expected future income level, it is reasonable to assume that his savings rate will increase quite a bit above the national average. For this analysis, I have used a savings rate of 15% [probably an error, he must have meant 10%] in 1986 rising to 25% in 2016 and thereafter.

**21.** Cunitz report:

From fiscal 1980 to fiscal 1985, the pre-tax return on equity in Harry's Kidsworld ranged from 16.3% to 78.6%, with an average return of 38.1% for the six years. As a conservative assumption, it was projected that Scott Ageloff would experience a return at half of that level, or 18%, for his personal savings reinvested in Harry's Kidsworld, Inc.

Dr. Cunitz testified at trial that "industry average showed a 22% return on stockholders' equity." R. Vol. 6, p. 31.

§ 768.18(5). Starting from these assumptions, Dr. Cunitz calculated that the prospective net accumulations of the estate, unreduced to present value, were $55,540,-850 (line 5 col. (c)).[22]

Both Goffman and Cunitz used a 6.5% rate of inflation over the remainder of Ageloff's life expectancy,[23] and discounted the prospective net accumulations to present

**22.** As did Dr. Goffman, Dr. Cunitz presented elaborate tabular data which for our purposes we need not present here.

In examining Dr. Goffman's and Dr. Cunitz' respective tables of calculations, we discern a likely discrepancy. In Dr. Cunitz' table, however, the use of the 18% rate of return is not readily apparent. Yet looking to the data in Cunitz' table for Ageloff's retirement years, yields a result of approximately 1.18, as is to be expected if an 18% rate of return was used in the computations.

His testimony on cross-examination indicates that Dr. Cunitz may have applied an 18% rate to some quantities and a 14% rate to other quantities when he formulated his table:

A: *In my projections, I was using the return on investment ratio [18%] and not the growth rate [13%]. But I used the growth rate in other projections.*

Q: You have a calculation, a table you have prepared, which has over in the right-hand column "Accumulated Savings—Start of Year" and "Accumulated Savings—End of Year." Are you familiar with that table?

A: Yes, I am.

Q: By what percentage did the last column increase each year?

A: Well, it varied, because the way that last column was calculated was to take the savings at the beginning of the year, add the annual savings for that particular year, plus an 18 percent return on the savings at the start of the year.

Q: 18 percent return on the savings?

A: That's correct.

R. Vol. 6, pp. 41–42 (emphasis added).

We merely point out this anomaly with the suggestion that it *may be* germane—nothing more. Certainly we do not intend for our efforts in this footnote to *constrain* any other court.

**23.** As to Cunitz, *see* n. 18, *supra*. As to Goffman, he testified at some length concerning the empirical underpinnings of the concept of inflation, R. Vol. 4, pp. 2–114 to 2–123, and then opined that "in my professional judgment, we are going to see an average inflation rate between 6 and 7, 6 and a half [percent], which is what we saw over the past 20 years.... We are talking about projecting from 30 to 50 years [into the future]."

value using a discount rate of 7%.[24] The Goffman $36,171,212 thus reduced to present value becomes $1,842,794 (line 7, col. (b)), and the Cunitz $55,540,850 becomes $2,829,688 (Table I, line 7, col. (c)).

Testifying for Delta, Dr. Mellish based *his* calculation of Ageloff's net accumulations on Ageloff's *actual* remuneration received from Kidsworld during the period from 1981 to 1985—i.e., Ageloff's income shown on his federal income tax returns.[25] Unlike Doctors Goffman and Cunitz he made no adjustment to reflect any difference between remuneration *received* and a greater amount *earned.* Dr. Mellish annualized the income figure for incomplete cal- endar year 1985, then accounted for inflation by adjusting all figures to 1986 dollars. Finally, he averaged those adjusted figures to yield an estimated 1986 income of $29,-688 (Table I, line 1, col. (d)). He then "took into account probable future increases in [Ageloff's] income, in real terms." [26] Mellish did not specify what growth rate he applied to Ageloff's income in making his calculations. His testimony quoted here does indicate, however, that that growth rate did *not* include a component due to inflation. Dr. Mellish predicted that Ageloff's "net accumulation rate" would have been 25% over the remainder of his life expectancy.[27] Dr. Mellish testified that he

24. In his written report, Goffman explained his use of the 7% rate:

> The approximate rate to discount future dollars to present worth is that which could be earned by an investor in a maximum-security investment. In other words, we must provide an outlet for present investments that is as risk-free as possible. In this instance, long-term U.S. government bonds are widely accepted as that type of investment, and hence their respective rates of return suggest the appropriate discount rate. At present, the long-term rate is approximately 10 percent (25+ years). Consequently, a discount rate of 10 percent or more would not be inappropriate. However, these forms of investment are taxable. At the dollar levels needed in this instance to compensate for the estimated economic losses, the effective tax rate on the yield would amount to an average of at least 30 percent. Consequently, their net (or after-tax) yield would be no more than 7 percent. We have, therefore, applied a 7 percent discount rate to reduce the net accumulations to present value.

As revealed by his written report, Cunitz' rationale was similar:

> The rate used in this discount calculation is the long-term rate for U.S. Treasury bonds, now providing less than 10%. On an after-tax basis, the rate would be about 7%.

25. Those returns show Ageloff's income as:

| CY | INCOME |
| --- | --- |
| 1981 | $35,800 |
| 1982 | $20,800 |
| 1983 | $37,467 |
| 1984 | $21,028 |
| 1985 | $23,762 |

R. Vol. 8, p. 74.

26. R. Vol. 8, p. 84.

27. This is not the same as a 25% savings rate. Counsel thought Dr. Mellish had misspoken, and asked if he had meant to say "savings rate" instead. Dr. Mellish explained that he had *not* misspoken:

> Net accumulation rates, because net accumulation is a bit different than savings. Net accumulation is the result of your level of savings. It is also a result of the increase in the value of the assets that those savings are put into.
> Nationally, for example, as I said, let's assume the 19 percent figure. That is a function of the rate of savings. Actually, nationally, the level of savings is less than 10 percent. It varies from one year to the next. It is typically between 5 and 10 percent. The net accumulation figure of 19 percent, that is a result of the savings rate and the income in the value of the assets.

R. Vol. 8, p. 83.

We do not discern the exact mathematical calculations necessary to compute from Dr. Mellish's 25% "net accumulations rate" and the corresponding *savings* rate applicable to Ageloff.

Dr. Mellish asserts (i) that a net accumulation rate differs from a savings rate only as "a result of the increase in value of the assets that those savings are put into," (ii) that there was no such increase in value applicable to Kidsworld, the assets into which Ageloff put his savings, and (iii) implicitly, that the difference between a "net accumulation rate" and a "savings rate" is in the instant case both real and relevant. Question arises, which we do not resolve, on whether these assertions are consistent. Assuming the truth of assertion (i), then either (ii) or (iii) may be true but not both. If assertion (ii) is rejected and assertions (i) and (iii) are accepted, then it would follow that (i) the savings rate applicable to Ageloff which corresponds to Dr. Mellish's 25% "net accumulations" rate is something less than 25%, and (ii) Dr. Mellish's "net accumulations rate" incorporates a component that accounts for the investment earnings which the saved income produces.

next considered the *possibility* that Ageloff's earnings at Kidsworld might be greater than the remuneration he actually received, but concluded that any funds Ageloff earned but left in Kidsworld would yield a negative rate of return (i.e., would gradually be lost through unprofitable operations).[28] Starting from these assumptions, Dr. Mellish calculated the prospective net accumulations of the estate at Ageloff's expected retirement at age 65 in A.D. 2021, reduced to present value, as \$305,026. Finally, Dr. Mellish predicted that Ageloff's cost-of-living consumption during the years between his projected retirement and the completion of his life expectancy, nine years later in AD 2030, then would have *diminished* his net accumulations.[29] The

> Despite Dr. Mellish's methodology, Delta's asserts that such interest earnings constitute "income from investments continuing beyond death," in contravention of § 768.18(5) and are not properly counted as part of net accumulations.

28. Dr. Mellish's conclusion on this point is problematic. In his testimony explaining how he reached this conclusion, he said that "in looking at the operation of a small business firm, you have to look at the bottom line[:] ... net profit plus officers' compensation. Because it is possible, and it is perfectly legal, to move money, in effect, back and forth between the net income [should be "profit"?] and officers' compensation categories." He then set out the figures for the period he examined:

| | |
|---|---|
| 1981 | + \$116,000 |
| 1982 | + \$ 64,000 |
| 1983 | + \$239,000 |
| 1984 | + \$131,000 |
| 1985 | + \$117,000 |
| 1986 | + \$ 70,000 |

Dr. Mellish observed that "if you put more into the compensation for officers, then you have less left over for net income. Or, conversely, if you choose to compensate officers less, then you have more left in the net income category." He then testified to the next step in his analysis:

> Now, I asked myself, "Mellish, if, instead, these individuals had an increased level of salaries, what would happen to the net income?" Let us assume for the moment that Mr. [Harold] Ageloff's [earnings were] actually 50,000; not the 75 that he said he was worth, but only 50. And Scott's [earnings were] 50, and Mrs. Ageloff's [were] 30,000. Then the bottom line would be a negative \$12,636.

R. Vol. 8, pp. 76–77.
On that basis, he concluded that the return on any investment in the business would be negative.

The assumption Dr. Mellish made at this point in his analysis—that the incomes of Scott Ageloff and his parents from Kidsworld in each case was less than the full amount of their respective *earnings* from the business seems inconsistent with his earlier analysis, i.e. that Scott Ageloff's income as shown on his federal tax returns for 1981 through 1985 represented the full amount of his *earnings* from Kidsworld.

> In addition, the evidence tended to show that prior to Ageloff's death, Kidsworld was expanding. It was opening additional stores and acquired an IBM mainframe computer to keep track of its concomitant larger inventory. To the extent that the funds used for that expansion came from the operations of the business rather than from borrowed funds or fresh infusions of capital from the personal funds of the Ageloff family members, the "return" from Kidsworld may have been greater than net profit plus officers' compensation—the "bottom line" measure that Dr. Mellish used. To tell whether it was in fact greater than his "bottom line" measure, we would have to know at least more about the accounting treatment given these large, extraordinary outlays of funds—specifically, whether those outlays were counted as one-time lump sum expenses or as the acquisition of a depreciable asset. Stated most generally, any such outlays over-allocated to the accounting periods that Dr. Mellish examined—and therefore, under-allocated to subsequent accounting periods—would cause Kidsworld's net profit (and, in turn, Dr. Mellish's "bottom line" measure) to be an *understatement* of the true and accurate figure.

29. Dr. Mellish did not set out any intermediate figures for prospective net accumulations *unre*duced to present value. On cross-examination he testified concerning his procedure for making the reduction to present value:

> Q: [Y]ou took a 1 percent growth rate [in Ageloff's income]; is that correct, sir?
> A: The method I have to getting present value of lifetime earnings is 1 percent.
> Q: That is taking inflation out of interest; is that correct?
> A: That is what is called a real interest rate approach.
> Q: Is that what you used?
> A: That's correct. Which takes inflation out of both the wage rate increase and *the discount factor,* which is a method that avoids predicting what the future rate of inflation is, because I don't think you can predict the future rate of inflation. So, you are dealing with magnitude, rather than nominal or market magnitudes.
> Q: And, Doctor, the consensus among Economists is between 1 and 3 percent; is it not, sir?
> A: The consensus on the real interest rate? Well, no, I don't think there is anything that

present value of the net accumulations remaining at the completion of Ageloff's life expectancy would have been $279,878 (Table I, line 7, col. (d)).[30]

The jury returned a verdict of $1 million in favor of the estate. In addition, the District Court awarded as costs witness fees [31] in excess of the $30 amount expressly authorized in 28 U.S.C. § 1821(b).[32] Delta's motion for a new trial was denied.

### Delta Appeals Florida and Federal Errors

Delta appeals, contending that the District Court erred by (i) permitting the augmentation of Ageloff's projected savings from his remuneration as an officer of Kidsworld [33] by the addition of projected income—for the balance of Ageloff's life expectancy—from the investments into which Ageloff hypothetically would have put those savings had he lived to the end of his life expectancy. The error, in Delta's view, is that such a course contravenes the language of Fla.Stat. § 768.18(5), which expressly excludes "income from investments continuing beyond death" from the computation of net accumulations. Delta further contends (ii) that even if the course followed below did not contravene § 768.18(5), then "[i]nterest income earned after the decedent's death ... on investments ... hypothetically made after the decedent's death" still "must clearly be excluded from calculations of the [estate's] lost net accumulations" because to do otherwise "provides [multiple] recovery for the [estate] and results in jury speculation and uncertainty in the law." Further, Delta contends that the District Court also erred by (iii) admitting evidence concerning the effects of inflation upon the dollar amounts of Ageloff's expected future "net accumulations," in contravention of F.R.Evid. 402, 403, 702, and 703, (iv) declining to give Delta's requested instruction that the dam-

has ever been written—you mean, on the real interest rate?

Q: You just got through telling me that in Scott Ageloff's case you used what is known as the real terms, and there you take the inflation out of interest, and that you used a 1 percent in order to take out the unpredictability of the interest and inflation rate?

A: No, you misunderstand. If I may clarify, *I assume an average of 1 percentage point spread between the future probable rate of increase in wages and the discount factor.* Now, the consensus among some people, I don't know if it is all Economists, is that the real interest rate by itself, without taking into it wage rate changes, is somewhere between 1 percent and 3 percent. You have two different things confused.

(Emphasis added). R. Vol. 8, pp. 148–49.

30. Neither Dr. Goffman's nor Dr. Cunitz's calculations included such a period of "de-accumulation" in the final nine years of Ageloff's life expectancy, because they both calculated that Ageloff's reinvestment in Kidsworld would yield a positive rate of return and that that income would continue beyond his retirement and would be greater than the amount he would spend for his own consumption during those years. Each as an intermediate step in his calculation did compute the prospective net accumulations of the estate, excluding the return on savings reinvested in Kidsworld, as of Ageloff's prospective retirement in the year 2021. Their figures at that intermediate step—shown in their written reports—were $2,235,359 and $3,247,763, respectively (unreduced to present value).

In the absence of their mutual assumption that the return on reinvested savings is properly a part of "net accumulations" as defined in Fla. Stat. § 768.18(5), both estate experts presumably would have incorporated a period of "de-accumulation" consisting of the nine years between Ageloff's prospective retirement and the end of his life expectancy since neither expert in his written report assumes Ageloff would during those nine years have had any source of income other than the return on reinvested savings.

31. The expert witness fees were:

| | |
|---|---|
| Dr. Goffman | $2500 |
| Dr. Cunitz | $2500 |
| Robert Klein, M.D. | $ 300 |
| Dr. Mellish (deposition fee) | $1411 |

32. 28 U.S.C. § 1821 provides in pertinent part:
(a)(1) Except as otherwise provided by law, a witness in attendance at any court of the United States, or before a United States Magistrate, or before any person authorized to take his deposition pursuant to any rule or order of a court of the United States, shall be paid the fees and allowances provided by this section.
. . . .
(b) A witness shall be paid an attendance fee of $30 per day for each day's attendance.

33. Computed in whatever fashion; *see* the earned/received distinction, n. 9 and accompanying text, *supra.*

age award would not be subject to federal income tax, and (v) awarding as costs expert witness fees in excess of the $30 amount expressly authorized in 28 U.S.C. § 1821(b). We certify the basic questions of law to the Supreme Court of Florida.

### The Quest for a Meaning

■ At the outset, Delta concedes that the relevant time period for calculating the recovery in a wrongful death case is the decedent's life expectancy. Delta accordingly does *not* assert that allowing recovery for Ageloff's projected investment earnings would constitute allowing recovery for "income from investments continuing beyond death" *merely* because those investment earnings pertain to a time period after the date on which Ageloff was killed in the crash of Flight 191. Delta then asserts that "[i]nvestments which continue beyond death, however, not only continue beyond the decedent's premature death, but also beyond his natural life expectancy, and therefore have no logical end point." Delta's view seems to be that the Florida legislature intended that the income from any investment that *potentially could be* continued beyond the decedent's natural life expectancy falls within the scope of the Express Exclusion. Yet it also seems possible that the Florida legislature intended the income from such an investment could logically be included in net accumulations *to the extent* that that income would have been received after the decedent's premature death but *before* the end of his natural life expectancy.

In the second branch of its § 768.18(5) attack, Delta urges that the lump sum recovery of the present value of Ageloff's projected savings from his remuneration as an officer of Kidsworld may be invested by the estate or the ultimate distributees in a fashion which would yield the same cash flows as the investments into which Ageloff would have put those savings had he lived to the end of his life expectancy. Therefore, according to Delta's view, those investment earnings are not lost to the estate and are not properly an element of the damages recoverable for the decedent's wrongful death.

The Express Exclusion may well mean merely that, with respect to assets which are income-producing at the time of the decedent's death, the tortfeasor has no responsibility for compensating or reimbursing the estate for the value of the earnings which that investment would have produced after the decedent's death. This construction seems plausible in that no recovery from the tortfeasor would be necessary since the income from decedent's *existing* investments would continue beyond his death. A savings account that a decedent owns at his death, for instance, continues to pay interest after his death. That interest is credited to the account periodically by the savings institution, and becomes part of the estate. Consequently, the income on those savings would not be part of the estate recovery, because none of that income has been *lost* to the estate by reason of the decedent's death.

The question remains, did the Florida *legislature* (i) share Delta's views and (ii) did it express that view by the inclusion of the words "excluding income from investments continuing beyond death" in § 768.18(5).

Determination of the true meaning of the Express Exclusion is essential to the determination of whether the jury verdict, and the judgment entered thereon, can stand.

### No Need to Guess Answer is Close at Hand

In our *Erie* role, we may resolve unsettled questions of state law in a diversity case in the way in which it appears to us that the Supreme Court of Florida would do had those questions come before it. Here, however, the course that the Supreme Court of Florida would take is sufficiently unclear that, rather than risk pronouncing a result which that court might ultimately elect not to follow, we follow the course—often pursued by this and our predecessor court, with enthusiastic support[34] of the U.S. Supreme Court—of certi-

---

**34.** *See Lehman v. Schein*, 416 U.S. 386, 94 S.Ct. 1741, 40 L.Ed.2d 215, and especially n. 6:

fying the significant issues to the Supreme Court of Florida for an authoritative answer.[35]

Having determined to certify significant issues to the Supreme Court of Florida, it is the custom and practice of this Court[36] for the Court to call on counsel to submit a joint proposed statement of facts and proposed questions to be certified.[37] This is to be done under the direction of the Clerk of this Court. *See West v. Caterpillar Tractor Company,* 504 F.2d 967 (5th Cir.1974); *Allen v. The Estate of Carmen,* 446 F.2d 1276 (5th Cir.1971); *In re McClintock,* 558 F.2d 732 (5th Cir.1977); *Pollock v. Govan Construction Co.,* 541 F.2d 1119, 1123 n. 16 (5th Cir.1976) and the cases cited there; *American Eastern Development Corporation v. Everglades Marina,* 608 F.2d 123 (5th Cir.1979), 587 F.2d 810 (5th Cir.1979). *See also Government Employees Insurance Company v. Brown,* 675 F.2d 645, (5th Cir.1982); *Sandefur v. Cherry,* 721 F.2d 511 (5th Cir.1983).

■ Certification of the substantive questions and the answers of the Supreme

Court of Florida are also essential for our subsequent determination of subsidiary evidentiary issues raised by Delta's appeal. This includes the question of the admissibility of evidence, factual or expert, on earnings from investment after Scott's actual, but before his hypothetical, death. Likewise this leads us to defer addressing Delta's contentions on the proper Florida standard on the method, or methods, to be employed in discounting to present value. We determine now that the Fifth/Eleventh Circuit decision in *Culver v. Slater Boat Co.,* 722 F.2d 114 (5th Cir.1983) (en banc), *cert. denied* 467 U.S. 1252, 104 S.Ct. 3537, 82 L.Ed.2d 842; 469 U.S. 819, 105 S.Ct. 90, 83 L.Ed.2d 37 (1984), relates to damage recoveries under federal law and not to diversity cases. Neither that case nor the Supreme Court's recent decision in *Monessen Southwestern Ry. Co. v. Morgan,* 486 U.S. ——, 108 S.Ct. 1837, 100 L.Ed.2d 349 (1988), requires that determining the discount rate must be performed by use of the below-market discount method rather than by the case-by-case method or the total offset method.[38] The Fifth Circuit has held

---

*Trail Builders Supply Co. v. Reagan,* 430 F.2d 828 (CA5 1970); *Gaston v. Pittman,* 413 F.2d 1031 (CA5 1969); *Martinez v. Rodriguez,* 410 F.2d 729 (CA5 1969); *Moragne v. States Marine Lines, Inc.,* 409 F.2d 32 (CA5 1969); revd on other grounds, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970); *Hopkins v. Lockheed Aircraft Corp.,* 394 F.2d 656 (CA5 1968); *Life Ins. Co. of Virginia v. Shifflet,* 380 F.2d 375 (CA5 1967); *Green v. American Tobacco Co.,* 325 F.2d 673 (CA5 1969); *Sun Insurance Office v. Clay,* 319 F.2d 505 (CA5 1963). The Fifth Circuit's willingness to certify is in part a product of frequent state court repudiation of its interpretations of state law. See the cases summarized in *United Services Life Ins. Co. v. Delaney,* 328 F.2d 483, 486–487 (CA5 1964) (Brown, C.J., concurring).

And most recently, *see Virginia v. American Booksellers Ass'n.,* 484 U.S. ——, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988).

**35.** Indeed, to its credit, Delta urges we take this course.

**36.** These pre–1981 Fifth Circuit decisions are effective for the Eleventh Circuit. *Bonner v. City of Pritchard, Alabama,* 661 F.2d 1206 (11th Cir.1981) (en banc).

**37.** As we uniformly do, *Martinez v. Rodriguez,* 394 F.2d 156, 159 n. 16 (5th Cir.1968) by the phrasing of the questions we disclaim any pur-

pose to restrict the Supreme Court of Florida to the specific words used. That court is free to restate the questions to assure sufficient answers to the real question perceived by that court. *In re McClintock,* 558 F.2d 732 (5th Cir. 1977), n. 9; *Corley v. Milliken,* 608 F.2d 238 (5th Cir.1979) n. 3; *Mills v. Damson Oil Co.,* 686 F.2d 1096 (5th Cir.1982) n. 28; *Anderson v. Jackson Municipal Airport,* 645 F.2d 401 (5th Cir.1981) n. 5; *Walters v. Inexco Oil Co.,* 670 F.2d 476 (5th Cir.1982) n. 7.

**38.** We recognize, without deciding, that the Fifth/Eleventh Circuit's en banc decision in *Culver v. Slater Boat Co.,* 722 F.2d 114 (5th Cir. 1983) may now be in doubt since *Monessen* requires the District Court in a federally based action to submit to the jury which method it will use in determining the discount rate. Rejecting *Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983) as holding that "the judge rather than the jury is to determine the discount rate in ... [federal] actions." *Monessen,* 486 U.S. at ——, 108 S.Ct. at 1846, 100 L.Ed.2d 362. *Monessen* declares that "[i]t is therefore permissible for the judge to recommend to the jury one or more methods of calculating present value so long as the judge does not in effect pre-empt the jury's function ... [provided the judge's instructions] do not 'subject the jury's estimate to ... rigid mathematics limitatio[n]'...." 486 U.S. at ——,

**390**

explicitly that *Culver* does not apply to diversity, non-federal, cases. *Lucas v. United States*, 807 F.2d 414 (5th Cir.1986).

As we read *Standard Coastline R. Co. v. Garrison*, 336 So.2d 423 (Fla.2d Dist.Ct. App.1976) Florida accords substantial discretion to the trial court to determine which, of several methods, the jury must use in calculating present value. If the parties are not in full agreement on the applicable Florida law, such questions may be included in the certificate to the Florida Supreme Court.

### Death and Taxes

◼ *Norfolk and Western Ry. Co. v. Liepelt*, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980) *requires* in cases arising under the FELA, 45 U.S.C. § 51 *et seq.*, (incorporated in the Jones Act, 46 U.S.C. App. § 688) an instruction that a damage award will not be subject to federal income taxation. In non-federal, e.g. diversity cases, the state case law determines whether the refusal to give such an instruction constitutes error. *See Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 485, 101 S.Ct. 2870, 2879, 69 L.Ed.2d 784, 796 (1981); *Croce v. Bromley Corp.*, 623 F.2d 1084 (5th Cir.1980); *see Parker v. DeKalb Chrysler Plymouth*, 673 F.2d 1178, 1180 n. 4 (11th Cir.1982).

Florida law permits an instruction that a damage award will not be subject to federal income taxation. *Poirier v. Shireman*, 129 So.2d 439 (Fla.2d Dist.Ct.App.1961). Such an instruction is not required, however, but is left to the discretion of the trial court. *Gray Drugfair, Inc. v. Heller*, 478 So.2d 1159 (Fla.3d Dist.Ct.App.1985).

The District Court did not err in refusing the requested jury instruction.

108 S.Ct. at 1846, 100 L.Ed.2d 362 (citation omitted).

*Culver,* over strong dissents, declared that for the Fifth (and in effect, the Eleventh) Circuit the below market discount method must, as a matter of law, be applied by both judge and jury.

**39.** *See, e.g., Wilmington v. J.I. Case Co.*, 793 F.2d 909 (8th Cir.1986); *Wuori v. Concannon*, 551

### The Price of Expertise

◼ Under 28 U.S.C. § 1920(3), expert witness fees are taxable as costs just as are any other witness fees. 28 U.S.C. § 1821 governs the amount of witness fees authorized. Although some courts have at times allowed expert witness fees in excess of those amounts to be taxed as costs,[39] the Eleventh Circuit has, however, declined to allow expert witness fees in excess of the statutory per diem fee as taxable costs. *Kivi v. Nationwide Mutual Ins. Co.*, 695 F.2d 1285 (11th Cir.1983). But all is set at naught by the Supreme Court's decision in *Crawford Fitting Company, et al. v. J.T. Gibbons, Inc.*, 479 U.S. 1080, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987).

We reverse the allowance of these expert witness fees.

AFFIRMED IN PART.

REVERSED IN PART.

AND QUESTIONS CERTIFIED.

F.Supp. 185 (D.Me.1982); *Pate v. General Motors Corp.*, 89 F.R.D. 342 (D.Miss.1981); *Henlopen Hotel Corp. v. Aetna Ins. Co.*, 38 F.R.D. 155 (D.Del.1965); cf. *Swan Carburetor Co. v. Chrysler Corp.*, 55 F.Supp. 794 (D.Mich.1944), *affirmed in part, reversed in part on other grounds*, 149 F.2d 476.